LOUISA, The (PACKARD v.). See Case No. 10,652.

# Case No. 8,530.

## The LOUISA A.

[Cited in Frates v. Howland, Case No. 5,066. Nowhere reported; opinion not now accessible.]

# Case No. 8,531.

## The LOUISA AGNES.

[Blatchf. Pr. Cas. 107.] [1]

District Court, S. D. New York. March Term, 1862.

PRIZE—SPECIAL CLAIM — BLOCKADE — NOTICE TO NEUTRALS—INTENTION TO VIOLATE—DECEPTIVE REPRESENTATIONS—ACTUAL WRONGDOER.

1. A claimant in a prize suit cannot put in a special claim or answer leading to issue other

[1] [Reported by Samuel H. Blatchford, Esq.]

than the one simply of prize or no prize, without the assent of the United States attorney or the special order of the court.

2. In order to affect a neutral with the penal consequences of a violation of a blockade, it is necessary for him to have been sufficiently informed of its existence.

3. An attempt by a neutral vessel to enter or evade a blockaded port, with knowledge or notice of the blockade, is a culpable violation of it, although no warning in writing is given to such vessel.

4. If a vessel approaches a blockaded port with knowledge of the blockade, and with the intention of violating it, her subsequent departure under the compulsory direction of a blockading cruiser does not reintegrate her to the state of an innocent trader, and she may still be arrested for the offence.

5. An attempt, on the part of a neutral owner, to mislead a blockading force by a deceptive representation of his vessel's papers, amounts to fraudulent misconduct, which justifies the confiscation of the vessel.

6. Every dissemblance in the papers will, in the judgment of the prize court, be regarded as intended to conceal what could not be safely disclosed, and as affording evidence that the destination of the vessel was falsified with a design to defraud.

7. The question discussed as to the proper method of investigating, in prize cases, acts of misconduct committed by captors on the prize property and the officers and crew of the vessel subsequent to their arrest.

8. The general rule in respect to captures by public ships is that the actual wrongdoer alone is responsible for any wrong done or illegality committed on the prize, excepting acts done by members of the seizing vessel in obedience to the orders of their superiors.

9. This court established this practice: That the right of reclamation for damages, in cases of captures made by public vessels, must be pursued by the parties averring the grievance and tort committed upon them, by plea and proof, which admit of counter allegations and full evidence under them.

10. An affidavit annexed to a claim is extrajudicial, and is not testimony in the cause.

11. A fraudulent attempt to violate a blockade warrants a condemnation, although the claimant may be able to show that the captors have been guilty of irregularities and wrongs towards the prize or its ship's company subsequent to capture.

12. Vessel and cargo condemned for an attempt to violate the blockade. Claimants ordered to sue out a monition to the captors, and file and serve the allegations and proofs on which they claim damages.

In admiralty.

BETTS, District Judge. The vessel above named, and cargo on board, were captured on the 9th of September, 1861, by the United States ship-of-war Cambridge, off the coast of Virginia or North Carolina, and sent into this port as lawful prize, and here libelled, in the name of the United States and the naval captors, on the 13th of September, charged "with being engaged in an unlawful voyage, and employed in an illegal trade, and being lawful prize of war." Josiah Slanghenright, as owner of the vessel, and James A. Moran, as owner of the cargo seized, interposed each a separate claim, by the same proctor, on the 21st of November thereafter, averring that they are British subjects, resident in Nova Scotia, and denying that the vessel and cargo are lawful prize; and each appends to his claim his test oath to the right of property alleged in his claim, and each also adds thereto a deposition of Robert Nichelson, the master of the vessel, detailing various particulars respecting the voyage, and prays that the deposition or schedule may be received as part of such respective claims. The papers found on board of the vessel at the time of her seizure prove her to be the property of Slanghenright, registered in his name at the port of Lunenburgh, Nova Scotia, June 15, 1859, and freighted by Moran, the other claimant, with a cargo of merchandise, at Halifax, where her crew was shipped, and she was cleared, August 21, 1861, for the United States. The voyage named in the shipping articles was "to a port or ports in the United States, and back to the port of Halifax."

On the hearing of the suit, the charge on the part of the libellants was, that the voyage was illegally and fraudulently undertaken, with the intent to violate the blockade of the port of Wilmington, in North Carolina, or some other blockaded port in the rebel states. The defence was, that the voyage was a lawful one, destined to a port in the United States, free to the commerce and trade of British subjects. The affidavit of the master of the vessel, attached as a schedule to the respective claims, "to be taken as a part of each claim," was also set up and insisted upon by each claimant as legal proof in his behalf. That deposition made allegations of misconduct committed upon the ship's company of the prize vessel by the captors after her seizure, namely: That the master and two of his crew were separated from the prize, and sent without her, to their serious inconvenience and wrong, to Baltimore, and from there, by railroad cars, to New York; that the writing desk of the master was improperly opened on board of the United States ship-of-war whilst he was thus detained; that papers were abstracted from it by the captors; and that two of the seamen on the prize were placed in irons, and sent with her so ironed to New York by the captors. These allegations are not admitted by the libellants, or otherwise established by direct proof on the part of the claimants. If the claimants may be allowed, at the discretion of the court, to vary the usual procedure in prize suits, by putting in special claims or answers, leading to issues other than the one simply of prize or no prize, this manifestly cannot be done without the assent of the United States attorney or the special order of the court. The papers filed in this instance by both claimants are without such warrant or authority, and must, therefore, be limited in their effect to mere denials of the cause of arrest.

The case, upon the preparatory proof, is prima facie adequate to demand the condemnation of the vessel and cargo seized. The facts made to appear in those proofs are concisely these: The vessel and cargo were both owned by British subjects, residents in Nova Scotia. The papers on board of the vessel when she was arrested duly authenticated those facts, as also that the voyage was projected and entered upon, and the vessel and cargo cleared from the port of Halifax on the 21st of August, 1861, bound for the United States of America. The crew were shipped on the same day "for a port or ports in the United States, and back to the port of Halifax." On the 6th of September she was boarded, from the United States ship Susquehanna, off Cape Lookout, (as stated in the deposition of the master of the schooner, interposed, as aforesaid, by the claimants, as part of their respective claims,) and warned not to enter any port between Cape Henry and the Gulf of Mexico; and on the 9th of September she was boarded for the third time, and then arrested by the United States ship Cambridge, thirty miles south of Cape Henry, on a course the reverse of that on which she was first boarded, and then sent, under charge of a prize master, to this port. The first entry in the log of the vessel was of her departure from Halifax, Friday, August 23; and the last, on Sunday, September 8, was the note of her log, "Lat. b. obs. 36° 07'. On the preceding day, September 7, the last entry in the log was a note of latitude 35° 42', and an obscure remark: "At 8 a. m. we was boarded be a man warr ship 36 to the N. of Cape Hateras." The log is inartificially kept, apparently by an illiterate man, and supplies no means of fixing accurately the time or points of the progress of the vessel along the coast. The next entry, on Tuesday, September 10, 1861, was apparently by the prize master, which reads: "Ee went on board the schooner as prize master at 1 p. m. lat. 36° 37' N., long. 76° 45' W." The movements of the vessel and her reckonings are not stated with perspicuity in her log, but it is very manifest she had gone entirely clear of and below the capes of Virginia, and away from any direction towards Baltimore, and was tracing her way within a few miles along the coast of North Carolina, indicating a purpose to make a port in that vicinity. It is observable that the log indicates no other purpose of aiming for Baltimore than the heading to each page of its entries. The invoice of the cargo, and the bill of lading of the same, and the clearance, were dated at Halifax, the 21st of August. The shipment was consigned to order, accompanied by a letter of instructions from the owner to the master, stating that his "main object will be to get into a port of North Carolina." If that is effected, he is directed to communicate with Mr. Flann, of Wilmington, with respect to a return cargo, which, it is desired, should be chiefly of spir-

its of turpentine. He is further instructed, if he does not succeed in getting into a Southern port, to proceed to Baltimore, and there deliver his cargo to Messrs. Crown & Jones. The owner further remarks, in the letter, that "he loaded a schooner for Wilmington in June last, but, through the bad conduct of the captain, she arrived at Baltimore." The witnesses examined in preparatorio testify that the vessel was solely under the authority and charge of the shipper of the cargo. This evidence would, by itself, denote, most unmistakably that the voyage was planned and prosecuted, to the time of capture, with the single purpose of carrying the vessel and cargo into one of the Southern and blockaded ports.

Two defences upon the merits are interposed by the claimants, and one in point of form against the validity of the capture. The formal one is, that the vessel was entitled to be warned off the blockaded port, and that, on such warning being given, she became discharged of all culpability by having immediately obeyed the notice, and changed her course, under the direction of the blockading vessel, for Baltimore, and continued that course for a succession of days, until her ultimate arrest. This objection would be of avail, under the general law, in case her approach to the blockaded ports was innocent, and in ignorance of their condition, without regard to the prerequisite of warning supposed to be connected with the imposition of blockades by the proclamation of the president; because the doctrine that, in order to affect a neutral with the penal consequences of a violation of blockade, it is necessary for him to have been sufficiently informed of its existence (The Rolla, 6 C. Rob. Adm. 367), is not contested in this suit, nor has it been in any previous prosecutions here. The rule administered in this court has been, both before and since the act of congress of August 6, 1861 (12 Stat. 326, § 3), that an attempt by a neutral vessel to enter or evade a blockaded port, with knowledge or notice of the blockade, was a culpable violation of it, although no warning in writing was given to such vessel. The act itself, committed by a neutral, in fraud of a belligerent right, carries with it the consequence of condemnation, whatever plausible pretences may be alleged for the visit. Upt. Mar. Warf. & Pr. 192.

If any question still remains as to that interpretation of law of blockade, anterior to the one imposed upon the ports of North Carolina, April 27, 1861, it does not appear to me that such uncertainty continues since the enactment of the above statute ratifying and affirming all acts, proclamations, or orders of the president after March 4, 1861; that, accordingly, the offence will have been completed in this instance, if the schooner approached a blockaded port with knowledge of the blockade and intending to violate it; and that her subsequent departure under

the compulsory direction of a man-of-war does not reintegrate the faulty vessel to the state of an innocent trader. Of the fact of knowledge and purpose chargeable upon the vessel and cargo, the evidence is positive and explicit on the face of the letter of instructions from the owner for the voyage and the shipper of the cargo before referred to. The knowledge of the blockade possessed by the claimants was not alone imputable to them because of the vicinity of Halifax to North Carolina, and the general state of commercial intercourse between those sections; there was, also, beyond the letter of instruction to the master, before cited, the letter from the shipper, of the same place and date, to his consignee in Wilmington, North Carolina, which says: "I have loaded the bearer (master of the schooner) with a cargo, in the hope that she may find her way into your port or some place in the Southern States;" and which, after directing the mode of investing the proceeds in tar, spirits of turpentine, &c., &c., contains this declaration: "I loaded a schooner for your port in June, but through the bad conduct of the captain, she arrived at Baltimore. Captain Nicholas has my confidence," &c. This implies, most forcibly, a full knowledge that the adventure was set on foot to a port then being in a state of blockade, and that the undertaking was meant, by the aid of former experience, to defeat and escape the force and effect of the blockade. These considerations displace all excuse of a want of warning or of innocent acquiescence. The vessel must be regarded as departing from the port sought, because of her forcible interception in attempting to enter it unlawfully, and not because the warning so received first apprised her of the illegality of the act.

The defence upon the merits that the voyage was not an illicit one, but was honestly undertaken and prosecuted to a loyal port of the United States, is wholly supplanted and falsified by the proofs referred to. Those items of proof demonstrate that the real and primary destination of the vessel was directly from Halifax to Wilmington, in North Carolina, an entry into which latter port was to be effectuated by the violation of its known blockade. The misrepresentation of the fact, entered upon the face of the log, must be understood as intended to deceive the captors. Each page of that document, from the inception of the voyage to the arrest of the vessel, is headed "A journal of a voyage from Halifax towards Baltimore;" and, on the evidence, that assertion was intended to create the false belief and confidence that the shipping articles and clearance on board, which named the destination of the vessel to be "a port or ports of the United States," or "bound for the United States," meant that she was destined and bound for the port of Baltimore. That conclusion would be a very natural one on the exhibition of the papers to a boarding officer,

and thus a fraudulent deception would be imposed upon him. An attempt on the part of a neutral to mislead a blockading force by a deceptive representation on his ship's papers amounts to fraudulent misconduct, which justifies the confiscation of the vessel. Indeed, every dissemblance in the papers will, in the judgment of a prize court, be regarded as intended to conceal what could not be safely disclosed, and to afford evidence that the destination of the vessel is falsified with a design to defraud. The Mentor, Edw. Adm. 207. In this instance, the bold and positive written instructions to the master to make his voyage to Wilmington or other Southern port dispenses with all reasoning from presumption as to the purpose and object for which the voyage was undertaken. It merits remark, also, that small confidence can be placed in the statements made by the mate and steward on the preparatory examination, that, when they shipped at Halifax, they supposed the vessel to be bound for Baltimore, and agreed for that voyage solely; because they both distinctly stipulated in the shipping articles for a voyage to "a port or ports in the United States," and nowhere named Baltimore as contemplated in the contract; and, also, because it is palpable from the log and from the knowledge they possess from the course of the vessel from Cape Henry to the place of her being turned back, and from that point along the coast, that they must (the mate, and most probably the steward) have well known, when they gave their testimony, that the vessel was destined for a blockaded port. These men admit, on their examination, that they were aware, when the shipping agreement was entered into by them, that the ports of Virginia and North Carolina were under blockade, and that the fact was of general notoriety in Halifax. The unsuccessful efforts of the claimant, acknowledged in his letter of August 21 to his consignee in June previous, to evade the blockade of Wilmington, brings home to him direct notice of the fact of such blockade.

Upon all these facts and circumstances, it seems to me that the evidence is conclusive that the voyage was instituted and prosecuted by the claimant with a premeditated design to evade the blockade, then efficiently supported, at the port of Wilmington, North Carolina. The actual presence of adequate force stationed before the ports where the arrest was made, and the authoritative proclamation of the blockade, are sufficiently established, and, accordingly, the claimants show no exemption from capture because of insufficiency of notice to them, or want of legal warning of the blockade, nor that their return backwards towards Baltimore amounted to an acquittance of the culpable misconduct of the vessel and cargo in undertaking to run the blockade.

A further ground of exoneration from the arrest is also suggested and earnestly

pressed, namely, that the capture is made illegal and void by acts of misconduct committed by the captors upon the prize property and the officers and crew of the vessel subsequent to their arrest. This objection has been urged as a conclusive defence to this suit, with the allegation that several cases, in addition to the present one, are still awaiting the consideration of the court, in which that cause of defence is more flagrant, and strenuous appeals are addressed to the court to redress the wrongs and losses inflicted upon neutrals by the course of conduct pursued during the present war by national vessels in the assumed enforcement of the law of blockade. The court will indulge in no general denunciation or stigma of the supposed malfeasances of public vessels in the performance of their duties in relation to prizes, but will carefully examine the facts brought to its attention, and endeavor to uphold and enforce with strict justice the legal rights and responsibilities of all parties implicated in prize proceedings brought before the court. It is to be presumed that the officers and crews of the navy are disposed to conduct themselves in obedience to their instructions, and to the rules of maritime law, in executing their war powers, in making prizes; and the rule and practice of prize courts fix their responsibilities and the manner in which they are to be enforced, in case injuries are sustained for misconduct on their part, whether the capture is sanctioned and carried into effect by the court, or is declared nugatory and unjustifiable.

In a case of that character recently before the court—The Jane Campbell [Case No. 7,205]—it was deemed expedient to refer the subject to the inquiry of the prize commissioners, to ascertain whether the imputations of malconduct made against the officers and crew of a public vessel were well founded, and to report the amount of injury received therefrom by the owners of the captured property, or the persons connected with the vessel seized. In that case the capture was disaffirmed, and the vessel and cargo were restored to the claimant, but the right to relief for injuries sustained from the wrongful acts of the captors was not regarded as dependent upon the acquittal or condemnation of the prize. That relief was proffered to the party who made suggestions to the court of loss and injury sustained by him from the captors of the vessel and cargo, in the proceedings after the capture; and it was granted on motion, without other formality of procedure, as incident to the cognizance of the subject of prize then before the court, but without admitting that to be the only or best method of adjudicating the matter; and there was, in that case, direct evidence of wrongful embezzlement of the prize property by the captors, whilst it was in their possession. A summary method of redress may be less appropriate to

cases resting on charges of wrongful conduct, in prize proceedings by officers and crews of public vessels, than against private cruisers, because the latter, beyond their relation and subjection to the court as suitors therein, are usually under express stipulations by contract for good conduct, and to indemnify parties suffering from their misbehavior in making prizes, which place the private cruiser and its armament under the direct discretion of the court, and particularly so when, as in the present case, the grievances imputed to the captors consist almost exclusively of personal torts committed to them. The pleadings in a prize action involve, directly, no further question than that of prize. The Adelaide, 9 Cranch [13 U. S.] 284; The Fortuna, 1 Dod. 83. The parties on the trial of that issue are not legally required, if they may be permitted, to litigate any point except that, and the probable sequents to it. In a qualified sense, the consideration whether the unlawful acts of captors, after the seizure of property as prize, do not render the arrest of it void, may be regarded as characterizing, vitally, the capture, and thus become intrinsically admissible evidence in defence against the conviction and forfeiture of the property. But yet that ground of defence need not necessarily be directly connected with the capture itself, or with the liability of the property to capture as prize, but may, and most probably will, spring out of facts wholly disconnected with either of those particulars.

The general rule in respect to captures by public ships is, that the actual wrongdoer alone is responsible for any wrong done or illegality committed on the prize, excepting acts done by members of the seizing vessel in obedience to the orders of their superiors. The Mentor, 1 C. Rob. Adm. 179; The Diligentia, 1 Dod. 404; 2 Wheat. Append. 13. The liability of the officer is not constructive, and affixed to him solely on account of his superiority of command, but arises from his immediate orders or authority in the transaction. The Eleanor, 2 Wheat. [15 U. S.] 345. Embezzlements of the cargo seized, or acts personally violent or injurious perpetrated upon the captured crew or improperly separating them from the prize vessel, or not producing them for examination before the prize court, or other torts injurious to the rights or health of the prisoners, may render the arrest of the vessel or cargo as prize defeasible, and also subject the tort-feasors to damages therefor. But the law does not constitute those acts or omissions legal bars to the suit, and it is plain that the course of investigation into those matters would not naturally be anticipated from the shape of the prize suit, nor could they be inquired into with that fulness befitting the gravity of the imputations or their importance to the public service, or the rights of individuals, so well and

satisfactorily in summary and incidental proceedings as in actions founded directly upon the injuries complained of.

The practice of prize courts supplies a cause of procedure under claims for redress, in cases of that description, which seems more proper to be pursued against public ships, when the consequences may also lead to other results than an award of pecuniary compensation to parties complaining of wrongs done them. A solemn monition may be directed to those using the authority of the government in seizing property at sea, compelling them to respond before the court to parties aggrieved by their acts for every wrongful use of authority confided to them; and thus, by pleas and allegations, the special grievances will be specifically charged and contested before the court, and the evidence pertinent to the contestation can thus be collected and laid before the court on both sides. The Eleanor, 2 Wheat. [15 U. S.] 345; The Magnus, 1 C. Rob. Adm. 31.

Merely interposing a statement of grievances by way of schedule attached to the claim of ownership, and the test oath which enabled a party to contest a libel of information in a prize suit, is not placing the controversy before the court in such an authoritative shape that parties are at once compellable to treat the allegations or suggestions as in litigation thereupon. It may well afford foundation for either party to appeal to the discretion of the court to proceed and render justice in the matter summarily, in the exercise of that pervading jurisdiction which envelopes prize proceedings. But, when there is reasonable cause to look for more thorough representation of the occurrence referred to than will commonly be obtained from ex parte statements, given under impressions likely to be colored by the excitement of sudden capture, and the risks and inconveniences following it, I consider it the more reliable course of practice to require the evidence to be furnished under pleas and allegations, when it is offered in bar of the rightfulness of a capture as prize, or as foundation for an award of compensation in damages, because of irregularities or culpabilities of captors who are in the public service in making the seizure or dealing with the prize property whilst in their possession. In The Magnus, 1 C. Rob. Adm. 31, Sir William Scott says that "the proof required was of the most solemn nature, by plea and proof." The proceedings by pleas and allegations admonish the parties of the difficulties of their situation, and call for all the proofs their case can supply. Wheat. Mar. Capt. 284.

It is to be remarked, in this case, that no evidence has been given on the examinations in preparatorio, or upon the papers of the vessel, showing any unlawful or irregular conduct of the captors in making the prize, or in the subsequent treatment of her crew or of the property arrested. The affidavit of the master, referred to as part of their claim by the claimants, is extra-judicial, and not testimony in the cause, and, if allowed by the court as notice to the libellants of charges impeaching the legality of the capture, cannot avail as testimony in the suit on the hearing. The like evidence was not permitted to have that effect in the case of The Jane Campbell [supra]. It was there only recognized as a basis for after summary proceedings, to establish the justness of the allegations, under the implied reserve that it could not, per se, sustain a decree against the captors for torts.

Two notes in the log-book, apparently entered by the prizemaster after the arrest of the schooner, state that he placed the mate and steward in irons on taking command of the vessel, and in the afternoon took the irons off for the day, replacing them for the night, and the next morning again removing them; alleging it to be discretionary with him to keep the men in irons day and night. No allusion is made by the men to the occurrence on their examination; and in such posture of the transaction the inference may be no stronger that the act was tortuous and unjustifiable than that it was an excusable precaution against menaces or well-suspected refractoriness of the prisoners. It is manifest, also, that separating the master and others of the crew, and not bringing them with the prize into port and before the court, was not necessarily culpable of itself, and may have been justifiable from the condition of the vessel or that of her crew.

No other violation of the rights of the claimants, or of their own legal obligations by the libellants in seizing the vessel, is attempted to be shown by the proofs before the court than the alleged irregularity of capturing her after she had been twice previously arrested and discharged by public ships for the same offence. Such relinquishment of an arrest by a captor, whether the first in order of time, or any after one in a series of consecutive arrests, whilst the vessel is in transitu, endeavoring to carry out a voyage illegal and culpable in its inception and purpose, amounts to no acquittance or condonation of the offence; and she remains under all her antecedent liabilities to the law, in like manner as if no imperfect interception of her voyage had been attempted. Great circumspection and precaution will, undoubtedly, be exacted in authorizing a second arrest, if any bona fide change of property intervenes between the arrests. The Eliza and Katy, 6 C. Rob. Adm. But when the arrest was already justified by the facts, it would be a very trivial irregularity for one ship to correct the immediately previous errors of others, in releasing improvidently, once or again, a captured vessel taken in flagrante delicto. No just exception, therefore, lies to sending a vessel in to be proceeded against in prize, because she had been in manual custody, on the charge previously, and liberated by the seizing officers without the mandate of a proper prize court. As before indicated, the

proofs before the court in the suit supply adequate cause for the condemnation and forfeiture of the vessel and cargo, and sentence to that effect is, accordingly, ordered to be entered. The fradulent attempt on the part of the claimants to violate the blockade incurs this judgment in favor of the United States, although the claimants may be enabled to show that the captors have been guilty of irregularities and wrongs towards the prize or the ship's company, subsequent to her capture. The government, on general principles, would not be debarred from vindicating their rights under the law of nations, against the criminal vessel and cargo, if it were proved that the captors, after making the prize, had, on their part, been also guilty of irregular and culpable conduct towards the prize property or crew. In that respect the court will sedulously administer the same measure of relief to injured parties, against captors acting in the public service, that is supplied by the law in relation to private cruisers. Yet, there may be reasonably observed differences in the method of enforcing it, because, in the case of public vessels, the ship's company are subject to the direction and authority of officers outside of those commanding the particular one engaged in the capture, and may be entitled by law to exemptions from personal responsibility, which could not be set up by the voluntary wrongdoer. Besides, the act for the better government of the navy subjects any person in the navy, for misconduct in relation to prize property, to forfeiture of his share of the capture, and such further punishment as the prize court shall impose. 2 Stat. 46, art. 8. In such cases, it seems to me, there is a special fitness in requiring that the right of reclamation for damages, in cases of capture made by public vessels, should be pursued by the parties averring the grievance and tort committed upon them, by plea and proof, which admit of counter allegations and full evidence under them. This will be the course of practice to be hereafter followed in like cases, unless otherwise specially ordered by the court.

It is accordingly directed that, within ten days after the entry of this decree, and notice thereof to the proctors for the claimants, they sue out a monition to the captors in this suit or their proctors, and file in court and serve on such proctors the allegations and proofs upon which relief is claimed in such proceedings, and that the captors, through their proctors, be allowed twenty days to file their answer and proofs in reply thereto, each party being entitled thereafter to bring the matter to a final hearing before the court, on two days' notice in writing. If the conditions above stated are not fulfilled, either party, upon the default of the other therein, shall be entitled to have final judgment entered in the suit, and take such after proceedings therein as are consonant to law and the practice of the court.